# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Marchello McCaster,

                        Plaintiff,           Civ. No. 09-3196  (RHK/AJB)

v.                                       **MEMORANDUM OPINION AND ORDER**

County of Ramsey, *et al.*,

                        Defendants.

---

Robert Bennett, Andrew J. Noel, Gaskins, Bennett, Birrell, Schupp, LLP, Minneapolis, Minnesota, Jeffrey M. Montpetit, Sieben, Grose, von Holtum & Carey, Ltd., Minneapolis, Minnesota, for Plaintiff.

Clifford M. Greene, Larry D. Espel, Greene Espel PLLP, Minneapolis, Minnesota, for Defendants.

---

## INTRODUCTION

On April 17, 2008, Plaintiff Marchello McCaster arrived at the Ramsey County Correctional Facility (the "RCCF") to begin serving a 56-day sentence for fifth-degree assault.  Less than two months later, on June 9, 2008, he was transferred to Regions Hospital in St. Paul; by that time, he had lost 44 pounds and was extremely ill due to active tuberculosis ("TB").  McCaster commenced this action in 2009 against the RCCF's superintendent, Allen Carlson; its nursing supervisor, Jeff Allen; five nurses he encountered while incarcerated (Nancy Mattson, Audrey Darling, Mary Clausen, Julie Nelson, and Patti Vodinelich) (together with Carlson and Allen, the "Individual Defendants"); and Ramsey County (together with the Individual Defendants, the

"Defendants"), asserting that they had been "deliberately indifferent" to his serious

medical needs.  The parties have undertaken extensive discovery and, with that discovery

now complete, Defendants move for summary judgment.  For the reasons set forth below,

the Court will grant the Motion in part and deny it in part.

## BACKGROUND

Suffice it to say, the evidentiary record before the Court is lengthy, and the parties

hotly dispute many of the salient facts.  The Court need not wade too deeply into the

morass, however, as it finds several genuine issues of material fact for trial.  The facts

recited below are intended to outline the relevant background and provide the reader with

a sufficient understanding of the Court's decision, see Fed. R. Civ. P. 52(a)(3); they are

taken in the light most favorable to McCaster, see Weitz Co., LLC v. Lloyd's of London,

574 F.3d 885, 892 (8th Cir. 2009).[1]

There is no dispute that McCaster had active TB upon arrival at the RCCF.  TB is

caused by bacteria that attacks tissue in the lungs.  It can require years to treat and in its

most virulent form can lead to death.  Persons who come into contact with someone

suffering from active TB may contract the disease simply by breathing the same air as the

infected individual.[2]

Because TB is so easily transmitted in close quarters, public-health departments

have long been aware of the risk of it spreading in confined spaces such as college

---

[1] At trial, of course, it will be up to a jury to resolve the disputed factual issues.

[2] This is what distinguishes active TB from latent TB; the latter is not contagious.  Notably, more than 80 inmates and corrections officers at the RCCF commenced an action in this Court after exposure to McCaster caused a TB outbreak at the facility; that action settled.

dormitories and detention centers.  The President of the National Commission on Correctional Health Care has testified before Congress that TB is "500 percent more common in prisons than in the general population."  Darby v. Schuetzle, Nos. 1:09-CV004, 1:09-CV-005, 2009 WL 700631, at *5 n.3 (D.N.D. Mar. 13, 2009).  For these reasons and others, Minnesota law mandates that persons detained for 14 days or more in a correctional facility be screened for TB.  See Minn. Stat. § 144.445.

The RCCF had a TB-testing protocol in place at the time McCaster arrived.  One issue raised in this action, however, is whether that protocol was constitutionally sufficient.  In 1998, Allen, who was in charge of the health unit at the RCCF, received and reviewed a report prepared by PROSAR, a health-hazard evaluation company, summarizing the findings of a TB "risk assessment" it had undertaken at the RCCF.[3]  The report contained recommendations to control the spread of TB among the RCCF's inmates, one of which was the development of a standardized health questionnaire to assess each incoming inmate's TB history and current symptoms, if any.[4]  This recommendation was never implemented by the RCCF.

_____

[3] One issue in this case is whether Allen is a "policymaker" for purposes of establishing liability against Ramsey County.  The Court need not decide that issue, however, because assuming *arguendo* that Allen is a policymaker, the claim against the County still fails, as discussed in more detail below.

[4] A later report from the United States Centers for Disease Control and Prevention ("CDC"), which Allen received prior to McCaster's incarceration, also recommended that inmates be "interviewed systematically (*i.e.*, using a standardized questionnaire) to determine whether they have experienced [TB] symptoms in recent weeks."  Defendants' proffered correctional-nursing expert, public-health nurse Caroll Niewolny, recognizes the importance of the CDC's TB guidelines and notes that they have been incorporated into Minnesota regulations; the Eighth Circuit has deemed the guidelines "authoritative."  DeGidio v. Pung, 920 F.2d 525, 530 n.11 (8th Cir. 1990).

Another recommendation in the 1998 report was for "Mantoux tuberculosis skin-test screening" in accordance with then-existing guidelines set by the CDC.[5]  While the RCCF had in place a policy of administering Mantoux tests to incoming inmates, nothing in that policy required the tests to be read between 48 and 72 hours after administration, as the CDC advised.  Various health professionals at the RCCF, including Allen, Mattson, and Darling, knew it was necessary for 48 hours to pass in order to achieve a valid test result.  Nevertheless, Defendants have stipulated that the RCCF's nurses commonly read Mantoux tests "two days" after administration, which may or may not have been more than 48 hours following injection because the RCCF's policy did not require recording the *time* of injection.

When McCaster arrived at the RCCF, he filled out a medical screening form that, while not TB specific, asked standard questions about then-ongoing medical problems; McCaster answered "no" to each question.  However, he also filled out a mental-health screening form, in which he answered "yes" when asked whether he had "lost or gained as much as two pounds a week for several weeks without even trying."  These forms were routed by the intake corrections officer to Mattson, McCaster's intake nurse.  When she met with McCaster, he denied any health problems to her.  She then took his vital signs, noted that his pulse rate was elevated, and administered a Mantoux test.  There is

---

[5] A "Mantoux test" involves the injection of fluid called tuberculin under the surface of an individual's arm.  The subsequent appearance of an "induration" (bump) over a certain size indicates TB.  See http://www.health.state.mn.us/divs/idepc/diseases/tb/factsheets/tst.html (last visited July 7, 2011).  Expert testimony in the record discloses that a Mantoux test read earlier than 48 hours after administration is "unacceptable" and that an induration may appear "significantly different" 48 to 72 hours after test administration than one observed 36 to 43 hours afterwards.  However, a Mantoux test is not always accurate and sometimes does not detect TB even when properly administered and read.

no dispute that both weight loss and elevated pulse rate can be symptoms of TB.  As the RCCF had no TB-specific questionnaire, Mattson did not ask McCaster any questions directly tied to that disease or its symptoms.[6]

On April 19, 2008, Darling interpreted McCaster's Mantoux test.  The parties have stipulated that she did so between 32.5 and 43.5 hours after the injection.  While McCaster noticed a bump on his arm, Darling did not measure it; she wrote down "0" for the size of the induration, but at some unknown time later changed the result to "5" (meaning 5 millimeters).  An induration less than 10 millimeters wide is considered negative for TB.

For the next month, none of the Individual Defendants had contact with McCaster. Evidence in the record, however, indicates that he was experiencing symptoms consistent with TB throughout that time.  For example, logs of his telephone calls indicate that he was repeatedly coughing from the moment he arrived at the RCCF, with the cough progressively worsening during his incarceration.  Other inmates testified that he was "visually sick" and could barely walk.  Several inmates housed in the same dorm as McCaster wrote "kites" – requests for medical care – to the nursing staff seeking treatment for him.  Nothing was done in response to those kites, often because they were not written by McCaster himself.  In fact, one nurse, Defendant Julie Nelson, testified that Allen told her an inmate must fill out his own kite in order to receive medical

---

[6] Dr. William Fithian, a psychiatrist proffered as Defendants' correctional-medicine expert, opined that under an appropriate TB-screening policy, nurses are "supposed to ask" questions about signs and symptoms of active TB when an inmate arrives at a correctional facility.

attention (Allen denies this).  Most of the kites submitted about McCaster cannot now be found, although there is ample evidence in the record that they were in fact written.[7]

Several corrections officers paint the same picture of McCaster's health during this period.  Officer Robert Ciak thought it was "obvious" something was wrong with McCaster by the first time he interacted with him on April 19.  So, too, did officer Christine Dimmick, who also first encountered him on April 19.  Officer Justin Peterson saw McCaster within two or three days of his arrival at the RCCF, and his initial observation was that McCaster was a "very sick inmate."  Officer Tonetter Closmore observed that McCaster was noticeably losing weight during his incarceration, walked like "an old man," constantly covered himself in a blanket, and was "shaky."  On several occasions corrections officers asked the nursing staff to check on McCaster but were met with apathy; the nurses reported either that they were aware of McCaster's condition or that if he needed medical attention he should fill out his own kite.  Evidence in the record also indicates that the RCCF's nursing staff often minimized corrections officers' concerns regarding inmate health.[8]

Expert opinion testimony also indicates that McCaster likely was experiencing symptoms throughout his incarceration.  For example, Dr. Fithian testified that McCaster

---

[7] For instance, Nelson acknowledged in her Answer to the Second Amended Complaint, and again in her deposition, that she saw a kite about McCaster signed by multiple inmates, but "was focused on the signatures" and did not read the kite's substance.  She also acknowledged that she did nothing in response.  McCaster suggests that the now-missing kites were destroyed, noting that after this lawsuit was filed, Clausen was overheard discussing the kites' possible destruction with Darling.

[8] Besides testimony from corrections officers to this effect, a training presentation approved by Allen includes a slide entitled "[o]fficer complaints about medical requests."  Listed on that slide is a complaint that "[n]urses just blow us off."

would have had "a productive cough and probably associated fever, chills, night sweats and lethargy" from the time of his arrival at the RCCF. Similarly, defense witness Dr. Lee Reichman, a pulmonologist with expertise in tuberculosis, opined that McCaster likely was exhibiting symptoms of TB, including a productive cough, both before and during his incarceration. Indeed, Dr. Reichman noted that because McCaster had infected his family members before his arrival at the RCCF, he "must have" been manifesting symptoms as of April 17, 2008, the day he began serving his sentence. Dr. Michael Iseman, also a pulmonologist with expertise in tuberculosis, noted that it was "improbable" that any trained health professional could have interacted with McCaster in May 2008 and "not have perceived an individual who is ill."

On May 20 and 21, 2008, McCaster submitted kites regarding a tooth infection, and Clausen saw him on May 21. She noted that his jaw was swollen, diagnosed a "possible abscess," and prescribed a ten-day course of penicillin. She did not, however, check McCaster's vital signs or take any other action.[9] Clausen saw McCaster again one week later, on May 28, in response to a kite he submitted about bilateral foot pain "since admission." She examined his feet and found nothing wrong, ultimately suggesting that

---

[9] McCaster makes much of the fact that (1) Clausen did not refer him to a dentist and (2) penicillin and other antibiotics do not cure tooth abscesses. The crux of this case, however, is the RCCF's failure to detect and treat McCaster's TB, not its treatment of his dental problems, and as set forth below there is a genuine issue whether Clausen may be held liable for that failure. Accordingly, the Court need not opine whether her alleged failings vis-à-vis McCaster's dental treatment also suggest deliberate indifference.

he switch shoes and elevate his feet.  Once again, however, she took no additional action, such as checking his vital signs, in response to this "peculiar" complaint.[10]

Inmates prescribed medicine must go to the RCCF's "medication call window" to receive it from a nurse.  From May 21, 2008, to June 4, 2008, McCaster was seen at the window more than a dozen times to obtain the penicillin prescribed for his tooth abscess; Nelson provided him with medication on at least nine of those occasions, and Vodinelich on three.  In no instance did he complain about his health, and each interaction with a call-window nurse lasted less than a minute.

Meanwhile, McCaster's condition continued to deteriorate.  He missed several doses of his prescribed penicillin and became lethargic.  He missed a meal on June 5, 2008, although there is no evidence any Individual Defendant was aware of that fact.  His cough, as evidenced by his call log, became more incessant.  On June 9, 2008, corrections officer Michael Plumley observed that McCaster was moving "very slow," and he seemed to be "less than fully coherent" – in Plumley's words, McCaster "looked like shit" and had "death" in his eyes.  Because he appeared so ill, Plumley asked Vodinelich to see him.  She responded that McCaster should submit a kite.  Plumley told her that McCaster's illness was "beyond the kiting stage," and Vodinelich replied, "[h]e's going to get out in a couple [of] days, he can go see his own doctor."

Plumley then went to his Lieutenant, who spoke with Vodinelich – she then agreed to see McCaster, and after becoming concerned about his vital signs and appearance, had

---

[10] Dr. Iseman opined that a complaint about disabling foot pain is atypical for a man of McCaster's age who is otherwise in good health.

him transported to Regions Hospital.  When he arrived, his pulse was significantly elevated, he had a temperature of 102.7 degrees, he was lethargic, and he complained of nausea, weight loss, night sweats, and chest congestion with a painful cough producing a "large amount of white-yellow sputum."  The wristband given to him upon admission noted that he was "[c]hronically sick looking" and "emaciated."  A chest x-ray revealed pneumonia with "extensive cavitary lung disease," which was ultimately confirmed as TB.  He spent the next three and one-half months at Regions, during which he was also diagnosed with pericardial effusion (fluid around the heart) resulting in heart damage, liver lesions, peripheral neuropathy (nerve damage) resulting in foot weakness that made it difficult for him to walk, and various other ailments.  The extent to which those ailments were caused by his TB (and/or the nurses' alleged delay in treatment) is unclear.

Pursuant to 42 U.S.C. § 1983, McCaster commenced this action in November 2009, asserting that Defendants were "deliberately indifferent" to his serious medical needs in violation of the Eighth Amendment to the United States Constitution.[11]  He also asserted a claim for negligence but has since stipulated to dismiss that claim.  (See Doc. No. 77.)  The parties have undertaken significant discovery, both in this case and the companion case brought by the persons who contracted TB from McCaster.  Transcripts (or portions thereof) from nearly 60 depositions have been submitted to the Court, together with various policies of the RCCF, medical records, and other documents.

---

[11] Section 1983 is the legal vehicle through which McCaster may vindicate his constitutional rights.  See, e.g., Goss v. City of Little Rock, Ark., 151 F.3d 861, 864 (8th Cir. 1998).

According to Defendants, this voluminous record makes clear that they are now entitled to summary judgment.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

I.    **The Individual Defendants**[12]

The Individual Defendants argue that they are entitled to qualified immunity on McCaster's claims.  In analyzing that assertion, the Court must conduct a two-part inquiry.  First, it must assess whether the facts alleged, when viewed in the light most favorable to McCaster, show that the challenged conduct violated a constitutional right.  If a violation could be established based on those facts, the Court must then determine whether the constitutional right at issue was clearly established on the date in question.  E.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004).[13]

The constitutional right under consideration here is the right to be free from cruel and unusual punishment under the Eighth Amendment.  There is no dispute that it was clearly established, at the time in question, that "deliberate indifference" to a prisoner's serious medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment.  See, e.g., Estelle v. Gamble, 429 U.S. 97, 104 (1976); Vaughn v. Greene Cnty., Ark., 438 F.3d 845, 850 (8th Cir. 2006).  The only question, therefore, is whether McCaster has proffered sufficient evidence to create a genuine issue that the

---

[12] The Individual Defendants have been sued in both their official and individual capacities.  It is well settled, however, that official-capacity claims are the functional equivalent of claims against the municipal entity in question, here Ramsey County.  See, e.g., Rogers v. City of Little Rock, Ark., 152 F.3d 790, 800 (8th Cir. 1998).  The claims against Ramsey County are discussed below.  (See infra at 22-23.)  The analysis that follows, therefore, concerns only the claims against the Individual Defendants in their individual capacities.

[13] The Supreme Court held in Pearson v. Callahan, 129 S. Ct. 808 (2009), that this two-step inquiry, which emanated from Saucier v. Katz, 533 U.S. 194 (2001), is "no longer . . . mandatory."  Id. at 818.  Rather, courts are now free (but not required) to skip the first step and proceed directly to whether the constitutional right at issue was clearly established when the alleged violation occurred.  Id.

Individual Defendants' conduct was deliberately indifferent to his serious medical needs. The Court must consider each Individual Defendant's conduct separately – "[l]iability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805-06 (8th Cir. 2010) (citation omitted).

"Deliberate indifference has both an objective and a subjective component." Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006). The objective component requires a plaintiff to demonstrate an objectively serious medical need. E.g., Grayson v. Ross, 454 F.3d 802, 808 (8th Cir. 2006); Moore v. Jackson, 123 F.3d 1082, 1086 (8th Cir. 1997). The subjective component requires a plaintiff to show that a defendant actually knew of, but disregarded, that need. E.g., Krout v. Goemmer, 583 F.3d 557, 568 (8th Cir. 2009); Grayson, 454 F.3d at 808-09. "For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Corr. Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted). In assessing each Individual Defendant's behavior, the Court must be cognizant that "[a]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 838 (1994).

### A.       The nurses (Mattson, Darling, Clausen, Nelson, and Vodinelich)

The nurses' principal argument is that each had only limited interaction with McCaster and, in that brief encounter, did not perceive him to be seriously ill.  Mattson, for example, highlights that she saw McCaster only once, on his first day at the RCCF. Darling had only a fleeting encounter with McCaster on April 19, 2008, when she read his Mantoux test.  Clausen saw McCaster twice, but only in connection with a tooth abscess and foot pain.  Nelson saw McCaster nine times, but each lasted only approximately a minute (or less) at the medication-call window.  And Vodinelich interacted with McCaster an even fewer number of times, on three occasions at the medication-call window before June 9, when she referred him to Regions Hospital.  (See generally Def. Mem. at 22-35.)

With their interactions compartmentalized in this fashion, the argument takes on some superficial appeal.  The nurses remind the Court that they cannot be held liable for the "failure to alleviate a significant risk that [they] *should have* perceived but did not." Farmer, 511 U.S. at 838 (emphasis added).  And they deny knowing that McCaster was seriously ill based on their limited interactions with him.

But the claim that the nurses were unaware McCaster was seriously ill is not dispositive.  Rather, the question is whether there exists sufficient circumstantial evidence in the record from which each nurse's knowledge may be *inferred*.  Id. at 842 ("Whether a prison official had the requisite knowledge . . . is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").  As the undersigned noted in Vaughn v. Gray, 557 F.3d 904, 909 n.5 (8th Cir. 2008) (Kyle, J.,

sitting by designation), a "prison official cannot be held liable for deliberately disregarding the serious medical needs of an inmate without proof of his actual knowledge of that . . . need . . . , [but] knowledge may be inferred when a risk is so obvious that a reasonable person would recognize it."  Put another way, "a factfinder may determine that a defendant was actually aware of a serious medical need, but deliberately disregarded it, 'from the very fact that the [need] was obvious.'"  Id. at 909 (quoting Farmer, 511 U.S. at 842).  Hence, each nurse's "self-serving contention that [she] did not have the requisite knowledge does not provide an automatic bar to liability" if there exists "objective evidence to the contrary" in the record.  Id. at 908; accord, e.g., Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006) ("Intentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention.").

Notably, it is important to recognize that McCaster need not show the nurses knew he was suffering from *tuberculosis*; it suffices for him to show that he was sick enough for a reasonable person to recognize he "require[d] medical attention."  Id. at 862; accord, e.g., Jenkins v. Cnty. of Hennepin, 557 F.3d 628, 633 (8th Cir. 2009).  Assume, for example, that a prison official knew an inmate was experiencing searing chest pain, shortness of breath, tingling down the left arm, and dizziness.  If the official ignored these urgent symptoms, he could not escape liability simply because he did not know the inmate was experiencing a heart attack – it would be enough to show that the official perceived *something* was seriously wrong requiring further evaluation.  See Farmer, 511 U.S. at 833 (deliberate indifference exists where official fails to act despite knowing that

- 14 -

inmate faces "a substantial risk of serious harm"). In other words, the question is *whether* an inmate was manifesting symptoms of a serious illness, not *what* that illness was.

Here, the Court finds that there exists sufficient evidence in the record to undermine the nurses' claimed ignorance of McCaster's serious medical need and to create a genuine issue whether they knew or should have known he required medical attention. Importantly, Defendants' own expert opinions recognize that as of mid-May 2008, McCaster was noticeably and demonstrably ill. Dr. Reichman testified that there was "no question" in his mind that as of May 21, 2008 – when McCaster first saw Clausen – he was "manifesting significant symptoms of active tuberculosis." Dr. Fithian similarly testified that "McCaster would have had outward manifestations of active tuberculosis on May 21." Dr. Iseman testified to the same effect. Moreover, non-medical professionals, including several corrections officers and numerous inmates, perceived McCaster as very ill by that time. The evidence, therefore, suffices to create a fact question whether McCaster was "obviously" ill by mid-May and, hence, whether the nurses he encountered after that time – Clausen, Nelson, and Vodinelich – were deliberately indifferent to his medical needs. See Farmer, 511 U.S. at 842.

The question is "closer" with respect to Mattson and Darling, who encountered McCaster earlier in his term of incarceration – indeed, each saw him within two days of his arrival at the RCCF, when he was indisputably less symptomatic. Nevertheless, the Court finds that McCaster has proffered sufficient evidence to create a genuine issue whether he was "obviously" ill as of that time. At intake, he indicated that he had

experienced recent weight loss, and Mattson noted that he was tachycardic.  Logs of his

telephone calls indicate that he was repeatedly coughing from the moment he arrived at

the RCCF.  Other inmates testified that he was "visually sick" and could barely walk

from day one.  Corrections officers Ciak, Peterson, and Dimmick thought it was

"obvious" something was wrong with McCaster when they first encountered him on

April 19, two days after his admission.  And Drs. Fithian and Reichman, both defense

witnesses, testified that McCaster likely was experiencing active TB symptoms, including

a productive cough, throughout his incarceration, as demonstrated by the fact that he had

already infected his family members by the time he arrived at the RCCF.  This evidence

is sufficient to satisfy McCaster's burden of demonstrating a genuine issue for trial vis-à-

vis Mattson and Darling.

  At the hearing on Defendants' Motion, the nurses contended that McCaster's

claims must fail because the inmate population at the RCCF is transient and, hence, their

job responsibilities did not mandate following up with inmates whom they suspected

might be sick.  But the nurses cannot use their job descriptions to shield themselves from

liability.  Were it otherwise, prison officials would have a great incentive to limit the

defined duties for each member of the prison's staff, allowing them to disclaim

responsibility for serious medical needs right in front of their eyes – *i.e.*, "he might be

really sick, but it's not my problem."  The law, however, prevents an official from

"insulat[ing] his potential liability for deliberately indifferent actions by instituting a

policy of indifference."  Howell v. Evans, 922 F.2d 712, 723 (11th Cir. 1991), vacated

pursuant to settlement, 931 F.2d 711 (11th Cir. 1991).  Put another way, blindly closing

one's eyes to the obvious – in this case, an obvious medical need – is a "species of intent" sufficient to support a finding of deliberate indifference.  McGill v. Duckworth, 944 F.2d 344, 351 (7th Cir. 1991); accord, e.g., Farmer, 511 U.S. at 843 n.8 (prison official does "not escape liability if the evidence show[s] that he . . . refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

By the same token, the nurses cannot avoid liability by pointing out that McCaster never requested medical attention and, in fact, expressly disavowed being ill.  Accepting this argument would, in essence, shift responsibility for inmate health from prison officials to the inmate himself.  For example, officials would not be obligated to provide medical care to an inmate found lying on the floor unconscious, because the inmate would be unable to request medical assistance.  Besides turning the Eighth Amendment on its head, such a result would be particularly inappropriate where, as here, a medical professional might perceive a serious medical need that an inmate/patient might not.[14]

The nurses also argue that McCaster's claims fail on causation.  Specifically, they contend that because their conduct must be viewed individually, McCaster is required to proffer evidence showing an injury resulting from *each* of their individual inaction.  (See

---

[14] The Eighth Circuit's decision in Krout, which the nurses referenced at the hearing to support this argument, is inapposite.  While the inmate there repeatedly informed prison officials that he did not need medical attention, the officials (i) checked on his condition every fifteen minutes, (ii) arranged for a medical technician to assess him, who informed the officials that "there was nothing abnormal" about his condition, and (iii) most importantly, "inquired several times whether he desired" assistance.  583 F.3d at 568-70.  These facts undermined the assertion that the officials were deliberately indifferent to his serious medical need.  Id. at 569.  No similar facts exist here – indeed, it is the nurses' *failure to inquire about McCaster's condition* that he assails as deliberate indifference in this case.

Def. Mem. at 21-22.)  And they argue that their "failures," taken individually, only resulted in delayed treatment for which McCaster cannot show, with admissible medical evidence (beyond speculation), any specific injury.  (See id.)[15]

Yet, there does not appear to be any dispute that McCaster's condition worsened over time.  Had any of the nurses undertaken steps to evaluate his "obvious" illness and begun treatment for it, at least *some* of his symptoms (such as his painful cough) would have abated sooner.  This additional suffering, no matter how minor it might seem compared to the overall constellation of McCaster's medical problems, is sufficient to support his claims.  See, e.g, Estelle, 429 U.S. at 103-04 (noting that failure to provide medical care in some instances might "actually produce physical torture or a lingering death," but is actionable even "[i]n less serious cases [that] result in pain and suffering which no one suggests would serve any penological purpose") (internal quotation marks and citations omitted); Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) ("Prisoners may prove deliberate indifference by showing that the total deprivation of medical care resulted in pain and suffering."); see also Roberson v. Bradshaw, 198 F.3d 645, 647-48 (8th Cir. 1999) (plaintiff could make out Eighth-Amendment claim based on delayed treatment of diabetes that caused only temporary problems such as "excessive urination and thirst, migraine-like headaches, diarrhea, sweating, weight loss, and dehydration").

---

[15] McCaster responds that "issues of causation . . . are irrelevant" to the Court's analysis, relying upon El-Ghazzaway v. Berthiaume, 636 F.3d 452 (8th Cir. 2011), and his brief therefore addresses Defendants' argument in one short paragraph.  (See Mem. in Opp'n at 29.)  But El-Ghazzaway did not hold that causation issues are irrelevant to a court's analysis of qualified immunity.  Rather, it held such issues are not *reviewable* in an interlocutory appeal of qualified immunity, because of the limited nature of the appellate court's inquiry in those circumstances. See id. at 460 n.3; see also Krout, 583 F.3d at 564-65.

The Court determines that there exists sufficient evidence from which a jury could find that each nurse was deliberately indifferent to McCaster's serious medical needs. Their Motion, therefore, must be denied.

### B.    Carlson and Allen

With respect to Carlson (the RCCF superintendent) and Allen (who was in charge of its health unit), it is important to recall that supervisory officials cannot be held liable for a constitutional violation under a *respondeat-superior* theory.  See, e.g., Schaub v. VonWald, 638 F.3d 905, 924 (8th Cir. 2011); Nelson v. Corr. Med. Servs., 583 F.3d 522, 534-35 (8th Cir. 2009).  "However, this does not mean that . . . to be held liable, [a supervisor] must have personally participated in any constitutional deprivation committed by [others], or must have known about any violation at the time it occurred."  Wever v. Lincoln Cnty., Neb., 388 F.3d 601, 606 (8th Cir. 2004).  Rather, McCaster can survive summary judgment by proffering evidence that Carlson's or Allen's "corrective inaction amount[ed] to deliberate indifference to or tacit authorization of" unconstitutional conduct.  Langford, 614 F.3d at 460.

### 1.    Allen

McCaster points out that before his arrival at the RCCF, Allen had long been aware of the CDC's recommended TB-screening policies, yet failed to implement them. He also points out that Allen knew 48 hours were required to pass in order to achieve a valid Mantoux test result, but it was common practice for the RCCF's nurses to read the tests before that time.  He claims these facts suffice to hold Allen liable; the Court does not agree.

Taking the second assertion first, there is simply no evidence in the record suggesting that the premature reading of McCaster's Mantoux test in any way contributed to delayed detection of his TB.  Indeed, it is undisputed that McCaster was administered a Mantoux test upon his admission to Regions Hospital, more than 6 weeks after he arrived at the RCCF, and the result was *negative*.  Moreover, McCaster has acknowledged that Mantoux tests are not always accurate and in some instances fail to detect TB even when properly administered and read.  On these facts, he cannot establish, except through speculation, that a premature reading of his Mantoux test caused his delayed treatment, and hence Allen's "corrective inaction" regarding those tests is not actionable.  See, e.g., Robinson v. Hager, 292 F.3d 560, 564 (8th Cir. 2002) (reversing judgment in favor of inmate who suffered stroke despite prison officials' knowledge that inmate suffered hypertension, because evidence was insufficient to demonstrate lack of hypertension medication caused stroke).[16]

As for McCaster's assertion regarding Allen's failure to implement the CDC's TB-screening policies, he must show that Allen (i) recognized a substantial risk of harm and (ii) nevertheless failed to act, despite knowing that his inaction was inappropriate in light of the risk.  Krout, 583 F.3d at 567.  The record does not create a genuine issue on these elements.  While there exists some evidence suggesting that Allen was aware of *better* or *more comprehensive* steps that could have been undertaken to detect TB at the RCCF, as recommended by the CDC, a fair reading of the record does not suggest that he

---

[16] The Court recognizes that "[c]ausation is generally a question of fact" in deliberate-indifference cases, but where "the causal link is so tenuous as to justify taking it from the trier of fact, a court may decide the issue as a matter of law."  Schaub, 638 F.3d at 921.

*knew* the RCCF's then-existing procedures were inadequate.  Notably, there is no dispute that the RCCF did, in fact, have a TB-testing protocol in place when McCaster arrived at the facility, which had been repeatedly reviewed by the Minnesota Department of Corrections and had been found to comply with its requirements.  There is also no dispute the Department designated the RCCF as a "low" or "minimal" risk facility for TB. Indeed, there had not been a case of active TB at the RCCF since well before Allen's tenure there began, suggesting that the procedures in place were working.  Finally, the CDC's recommendations were just that:  recommendations.  They were not mandates.

Based on this evidence, the Court determines that McCaster has failed to show that Allen recognized the RCCF's TB policies were inadequate, but opted not to do anything about it.  At best, the evidence shows that he may have been grossly negligent in failing to implement more thorough policies, but gross negligence is not enough.  E.g., Popoalii, 512 F.3d at 499; see also Krout, 583 F.3d at 567 ("Even if an official acts unreasonably in failing to take particular measures . . . at a jail facility, . . . reasonableness is a negligence standard, and negligence cannot give rise to a deliberate indifference claim.").

### 2.    Carlson

The evidence is even weaker with respect to Carlson.  McCaster argues that Carlson "understands that he must ensure that the inmates at his facility are provided proper medical care" and, in his "systematic[] review[]" of the RCCF's policies, he "failed to ensure that [the] RCCF's TB screening policy was in compliance with CDC guidelines."  (Mem. in Opp'n at 37.)  Yet, "a general responsibility for supervising the operations of a prison is insufficient to establish . . . liability," Camberos v. Branstad, 73

F.3d 174, 176 (8th Cir. 1995), and there is simply *no* evidence indicating that Carlson had any knowledge the RCCF's TB policies were deficient.  Unlike Allen, for example, there is no evidence establishing that Carlson was aware of the 1998 RCCF Tuberculosis Assessment report or the CDC's TB-screening recommendations.  Moreover, the Court does not believe that Carlson's review and approval of the RCCF's TB policy is a sufficient "hook" for possible liability, because nothing indicates that he has any medical training or experience.  See id. (finding no violation where supervisory prison officials "lacked medical expertise").

Distilled to its essence, McCaster's argument is that Carlson must be liable because he had overall responsibility for the RCCF and its policies.  This does not suffice.

## II.   **Ramsey County**

A municipality such as Ramsey County is a "person" for purposes of Section 1983 and, therefore, subject to liability for constitutional violations.  E.g., Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).  Such liability, however, attaches only if the plaintiff can show that the municipality "operates under a policy or custom that unconstitutionally deprive[d] [him] of his . . . rights."  Kuha v. City of Minneapolis, 365 F.3d 590, 603 (8th Cir. 2003), overruled on other grounds by Szabla v. City of Brooklyn Park, 486 F.3d 385 (8th Cir. 2007) (*en banc*).  Here, McCaster argues that Ramsey County had a custom of deliberate indifference, as evidenced by its (1) failure to implement the CDC's recommended TB-screening policies and (2) practice of prematurely reading Mantoux tests.  (Mem. in Opp'n at 31.)

To survive summary judgment on this claim, McCaster must proffer evidence showing (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the RCCF's employees; (2) deliberate indifference to or tacit authorization of such conduct by Ramsey County's policymaking officials after notice to them; and (3) that the custom was the "moving force" behind the constitutional violation in question.  E.g., Kuha, 365 F.3d at 603 (quoting Ware v. Jackson Cnty., Mo., 150 F.3d 873, 880 (8th Cir. 1998)); Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999).  He cannot do so, for the reasons set forth above:  (a) with respect to the "inadequate" TB-screening policies, McCaster fails on the second prong because he cannot show deliberate indifference or tacit authorization of unconstitutional conduct by Carlson or Allen, and (b) with respect to the premature reading of his Mantoux test, he cannot show that such conduct was the "moving force" behind his delayed TB diagnosis. At bottom, just as the claims against Carlson and Allen fail, so, too, does the claim against Ramsey County.

## III.   Injunctive relief

Finally, the Court pauses to address Defendants' argument regarding injunctive relief – that although McCaster sought in his Complaint an injunction mandating changes to the RCCF's medical policies and procedures, this request is now moot because he is no longer incarcerated at the facility.  (Def. Mem. at 43-44.)  In addition to McCaster not responding to this argument, the Court determines that it has merit.  See, e.g., Meuir v. Greene Cnty. Jail Employees, 487 F.3d 1115, 1119-20 (8th Cir. 2007).  Accordingly, the Court will dismiss his claim for injunctive relief.

- 23 -

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 82) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** with respect to McCaster's claims against (i) Allen Carlson; (ii) Jeff Allen; (iii) Ramsey County; and (iv) the nurses (Nancy Mattson, Audrey Darling, Mary Clausen, Julie Nelson, and Patti Vodinelich) in their official capacities, and those claims are **DISMSISED WITH PREJUDICE**.  The Motion is further **GRANTED** to the extent McCaster seeks injunctive relief.  The Motion is **DENIED** with respect to the claims against the nurses in their individual capacities.[17]


Date:  July 11, 2011

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

[17] The Court reminds the parties that this case is on its September 2011 trial calendar.  The parties should be fully prepared to try this matter in September 2011.